UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NICKOLAS J. BARTH,

                Plaintiff,

     v.

PATRICIA CHRISTIANSEN, *et al*.,

                Defendants.

Case No. C18-897-RAJ-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff is a former state prisoner who filed this action while confined at the Monroe Correctional Complex ("MCC") – Twin Rivers Unit ("TRU"). Plaintiff alleges in his complaint that the individual Defendants named therein violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution when they failed to provide adequate care for his serious medical needs, and intentionally denied him needed care. Plaintiff also alleges that MCC and Washington Department of Corrections ("DOC") supervisory officials failed to properly train and supervise their subordinates. Defendants in this action are G. Steven Hammond, M.D., Chief Medical

REPORT AND RECOMMENDATION - 1

Officer for the DOC, and MCC-TRU medical providers PA-C Patricia Christiansen, Julia Barnett, M.D., and PA-C Robin Smith.[1] Plaintiff seeks declaratory relief and damages.

Defendants Hammond, Christiansen, Barnett, and Smith now move for summary judgment.[2] Plaintiff has been advised of the summary judgment requirements pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), but has filed no response to Defendants' motion. The Court, having reviewed Plaintiff's complaint, Defendants' motion for summary judgment, and the balance of the record, concludes that Defendants' motion should be granted, and that Plaintiff's complaint and this action should be dismissed with prejudice.

## II. FACTS

Plaintiff entered DOC custody in July 2015 and was assigned to MCC-TRU. (*See* Dkt. # 1 at 4.) At some point prior to entering DOC custody, Plaintiff was diagnosed with multiple sclerosis ("MS"), a potentially disabling disease of the central nervous system. (*Id.*; Dkt. # 26, ¶ 4.) MS is a disease in which the immune system attacks the protective sheath that covers nerve fibers and causes communication problems between the brain and the rest of the body. (Dkt. # 26, ¶ 4.) The claims set forth in this action pertain to the manner in which the pain and fatigue associated with Plaintiff's MS were managed by the DOC and Plaintiff's MCC-TRU medical providers.

---

[1] Plaintiff identified additional Defendants in his complaint including the DOC, MCC-TRU medical providers J. Parks and L. Hedges, and former DOC Medical Director Dr. Lauren. However, the DOC was previously dismissed as a Defendant in this action (*see* dkt. ## 22, 23), and the remaining individual Defendants were never served and are therefore not represented in this action (*see* dkt. # 8 at 1, n.1; dkt. # 25 at 1, n.1).

[2] Defendants note in their summary judgment motion that the arguments set forth therein apply equally to the represented and the unrepresented parties. (Dkt. # 25 at 1, n. 1.)

REPORT AND RECOMMENDATION - 2

### A.     Pain Medication

According to Plaintiff, his MS, which had been relatively stable prior to his entry into DOC custody, began progressing after he arrived at MCC-TRU. (*See* Dkt. # 7 at 4.) Plaintiff states that he started off managing his symptoms comfortably, and he was receiving satisfactory medical care including opiates for pain management. (*See id*.; Dkt. # 26, Ex. 1.) However, in late 2016, when Plaintiff requested that he be allowed to continue receiving opiate medication for pain management, the DOC Care Review Committee[3] ("CRC") denied the request, concluding that pain management with opiate medication was not medically necessary. (*See* Dkt. # 26, ¶ 5 and Ex. 1.)

The CRC's report from its November 2, 2016 meeting shows that the committee, in determining the appropriateness of continued opioid treatment, took into consideration the recommendation of Dr. Michael Persenaire, a neurologist at the University of Washington ("UW") MS Clinic, who indicated that opioids have no place in the treatment of chronic pain associated with MS. (*Id*., ¶ 7 and Ex. 1.) Dr. Annette Wundes, another neurologist at the UW MS Clinic, agreed with Dr. Persenaire on this issue. (*See id*.) The report shows that the committee also took into consideration the fact that Plaintiff had a documented history of substance abuse. (*See id*., ¶ 8 and Ex. 1.) Opioids are extremely addictive and are typically not recommended for individuals who have a history of substance abuse. (*Id*., ¶ 8.)

At the time of the CRC meeting, Plaintiff was being provided multiple pain medication regimens, as well as MS medications, based on the recommendations of his specialist. (*Id*., ¶ 8.) Among the medications being provided at that time was Gabapentin, a first line treatment for

---

[3] The CRC is a group of DOC primary care physicians, physician assistants, and advanced registered nurse practitioners that reviews and decides the medical necessity of proposed health care in accordance with the Offender Health Plan. (Dkt. # 26, ¶ 5.)

REPORT AND RECOMMENDATION - 3

neuropathic pain associated with MS. (*Id.*) Subsequently, in December 2016, Plaintiff was placed on the drug Lyrica (pregabalin), on the recommendation of his neurologist, after other pain medication therapies proved unsuccessful. (*See id.*, ¶ 8 and Ex. 2.)

### B. Medical Emergencies

Plaintiff asserts that he declared medical emergencies on November 15, 2016 and June 30, 2017 because he was experiencing extreme pain but was denied care. (Dkt. # 7 at 4.) Plaintiff was apparently assessed by nursing staff at sick call in response to his emergency complaints, but he showed no signs of new illness or injury, nor any change in his chronic medical condition, and his vital signs were stable. (Dkt. # 26, ¶ 9.) The nursing staff therefore advised Plaintiff to sign up to see his provider which is standard practice for patients who go to sick call but show no obvious signs of acute illness. (*Id.*)

Plaintiff complains that though he was repeatedly advised to work with his provider to address his ongoing concerns regarding his pain, the facility and its medical providers had a practice of having inmates sign up to see a provider, but then making them wait an average of six to 12 weeks before being seen. (Dkt. # 7 at 4.) PA-C Christiansen, Plaintiff's treating provider at MCC-TRU, states that this did not occur with respect to Plaintiff's care because she made specific arrangements to see Plaintiff frequently in order to allow close monitoring of changes to his medical status and to manage his care as effectively as possible. (Dkt. # 26, ¶ 10.) PA-C Christiansen indicates that she requested Plaintiff be scheduled approximately every two weeks, and that he was seen 32 times between June 2016 and January 2018. (*Id.*)

### C. Fatigue Medication

Plaintiff's final complaint concerns fatigue, another significant symptom associated with his disease, which caused him to fall asleep or become drowsy throughout the day and which got

REPORT AND RECOMMENDATION - 4

worse as his MS progressed. (Dkt. # 7 at 5.) Plaintiff asserts that the fatigue affected his ability to participate in two classes in which he was enrolled - small business class and beekeeping class - and he complains that the CRC did not approve his specialist's recommendation of a drug for "fatigue management" on the grounds that the medication was not medically necessary. (*Id*.)

In March 2017, Dr. Wundes, Plaintiff's neurologist, recommended consideration of a Ritalin trial to address Plaintiff's fatigue. (Dkt. # 26, ¶ 11.) Dr. Wundes also recommended a trial decrease in another of Plaintiff's medications, Baclofen, to see if that helped with his fatigue, and she indicated that it was appropriate to continue treating Plaintiff's fatigue with Amantadine if the medication was proving beneficial to him. (*See id*., ¶ 11 and Ex. 3.) The CRC met on March 22, 2017 to consider the recommended Ritalin trial. (*Id*., ¶ 12.)

In addition to Dr. Wundes' recommendation, the committee considered information contained on the National MS Society webpage which showed that Ritalin is one of three first line agents for fatigue. (*Id*., ¶ 12 and Ex. 3.) The other two first line agents identified were Modafanil and Amantadine, a drug Plaintiff was already receiving. (*Id*.) Ritalin and Modafanil are both thought to have significant abuse potential which makes them more risky in a prison environment where they are sought after by other inmates who can strong-arm patients who receive such drugs. (*Id*.) The CRC ultimately determined that the Ritalin trial was not medically necessary. (*Id*.)

In May 2017, Plaintiff was unable to stay awake in his small business class and was informed that he would be reprimanded by officers if he was falling asleep. (Dkt. # 7 at 5.) In June or July 2017, a multi-disciplinary care conference was convened to discuss possible accommodations to facilitate the continuation of Plaintiff's education in light of his medical condition. (*Id*. at 5, 19.) It was decided at that meeting that Plaintiff would only go to school

REPORT AND RECOMMENDATION - 5

half-time. (*Id*. at 5.) Plaintiff asserts that shortly after that decision was made, he received an infraction for being unable to stay awake in class. (*Id*.) Plaintiff further asserts that in March 2018, he was forced to drop his beekeeping class because of his fatigue. (*Id*.)

### III.   DISCUSSION

#### A.   Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at

REPORT AND RECOMMENDATION - 6

585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

  **B.**  **Section 1983 Standard**

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

REPORT AND RECOMMENDATION - 7

A defendant cannot be held liable solely on the basis of supervisory responsibility or position. *Monell v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691–94 (1978). Rather, a plaintiff must allege that a defendant's own conduct violated the plaintiff's civil rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385–90 (1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81 (9th Cir. 1984)).

### C. Eighth Amendment

The treatment a prisoner receives in prison, and the conditions under which he is confined, are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement. *Id*. This duty includes ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking reasonable measures to guarantee the safety of inmates. *Id*. In order to establish an Eighth Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a subjective component. The Eighth Amendment standard requires proof that (1) the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the prison official acted with a sufficiently culpable state of mind. *Id*. at 834.

The objective component of an Eighth Amendment claim is "contextual and responsive to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The state of mind requirement under the subjective component of the Eighth Amendment standard has been defined as "deliberate indifference" to

an inmate's health or safety. *Farmer*, 511 U.S. at 834. Under the "deliberate indifference" standard, a prison official cannot be found liable for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. *Id*. at 837.

The Ninth Circuit has explained that "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation marks omitted). "[A] serious medical need is present whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

It is well established that a mere difference of opinion concerning proper medical care is not sufficient to establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). In order to prevail on an Eighth Amendment claim which involves choices between alternative courses of treatment, a plaintiff must show "that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Id*. at 332 (citations omitted).

1. Pain Medication

Plaintiff asserts that defendants exhibited deliberate indifference to his serious medical needs when they failed to ensure that he receive proper treatment for his MS including chronic pain medication. (*See* Dkt. # 7 at 5-6.) Specifically at issue is the CRC's determination on November 2, 2016 that chronic opioids were not medically necessary to treat the chronic pain associated with Plaintiff's MS. (*See id*. at 4-6.) Plaintiff suggests in his complaint that the CRC's

REPORT AND RECOMMENDATION - 9

actions deprived him of any pain management for his disease. (*See id.* at 4.) The record simply does not bear this out.

The evidence in the record shows that Plaintiff had at some point prior to the CRC's November 2, 2016 meeting been prescribed opioid medications for pain management, including morphine and oxycodone. (*See* Dkt. # 26, Ex. 1.) The request presented to the CRC was that Plaintiff continue to receive opioid drugs to treat his chronic neuropathic pain. (*See id.*, ¶¶ 5, 6 and Ex. 1.) The report of the CRC shows that the committee considered various factors in assessing the need for chronic opioids. (*See id.*, ¶¶ 7, 8 and Ex. 1.) In particular, the committee took into consideration the recommendation of experts in the field of MS, experts involved in Plaintiff's care, who specifically advised against the use of opioids in the treatment of chronic pain associated with MS. (*Id.*, ¶ 7 and Ex. 1.) The committee also took into consideration Plaintiff's history of substance abuse and determined that chronic opioids were, in fact, contraindicated in his case. (*See id.*, ¶ 8 and Ex. 1.)

Though the committee rejected Plaintiff's request for continued opioid treatment, at the time of the committee meeting Plaintiff was being provided multiple pain medication regimens, including Gabapentin which is one of the first line treatments for neuropathic pain associated with MS, and he was also being provided MS medications based on the recommendations of his MS specialist. (*Id.*, ¶ 8.) Plaintiff was subsequently placed on another drug for pain, Lyrica, based on the recommendation of his neurologist. (*Id.*)

The record makes clear that Plaintiff's desired treatment was contrary to the opinion of not only the CRC, but also to his treating specialists at the UW MS Clinic. Plaintiff, in fact, received care consistent with the recommendations of his specialists including both pain medication and MS medications. The fact that Plaintiff disagreed with the decisions of the CRC

REPORT AND RECOMMENDATION - 10

and/or his medical providers regarding pain management is not sufficient to establish an Eighth Amendment violation.

              2.       *Medical Emergencies*

Plaintiff asserts that on two occasions, November 15, 2016 and June 30, 2017, he declared medical emergencies due to extreme pain and was denied care. According to Plaintiff, PA-C Smith and PA-C Christiansen ordered another staff member, C. Klimper, not to treat him. Plaintiff submitted in support of his complaint documentation showing that on the dates in question he filed emergency complaints which were deemed non-emergent by MCC staff. (Dkt. # 7 at 20, 22.) Plaintiff's documentation also shows that, at least with respect to the June 30, 2017 incident, he was assessed by nurses at sick call, but it was determined there was nothing that could be done for him at that time because his complaints pertained to a chronic problem which was already being treated and not to a new, acute issue. (*Id*. at 21.)

PA-C Christiansen, in her declaration in support of defendants' summary judgment motion, indicates that her recollection of these incidents is that Plaintiff was assessed by nursing staff at sick call and showed no signs of a new illness or injury, nor any change to his chronic medical condition, and his vital signs remained stable. (Dkt. # 26, ¶ 9.) Plaintiff was therefore advised to sign up to see his provider which, according to PA-C Christiansen, is the standard practice for patients who go to sick call but have no obvious signs of acute illness. (*Id*.) PA-C Christiansen's description of events is consistent with the documentation submitted by Plaintiff in conjunction with his complaint.

The mere fact that the medical staff disagreed with Plaintiff's assessment of what constituted a medical emergency, and instead insisted that he follow the standard practice for seeing a provider, does not rise to the level of a constitutional violation. The record makes clear

REPORT AND RECOMMENDATION - 11

that Plaintiff was seen consistently between June 2016 and January 2018 for purposes of monitoring and managing his MS care, and he offers no evidence that he suffered any significant harm as a result of being required to follow standard institutional practices for seeing his health care provider. To the extent Plaintiff suggests that the average wait time to see a health care provider; *i.e.*, six to 12 weeks, was excessive, the evidence in the record demonstrates that this time frame, even if accurate as to the general inmate population, did not apply to him. (*See id.*, ¶ 10.) In sum, Plaintiff fails to establish a violation of his Eighth Amendment rights arising out of the alleged failure of defendants to properly respond to his medical emergencies.

### 3. Fatigue Medication

Plaintiff asserts that Defendants exhibited deliberate indifference to his serious medical needs when the CRC determined that his specialist's recommendation for fatigue management, medication was not medically necessary. (Dkt. # 7 at 5-6.) Plaintiff claims that as a result of the CRC's refusal to approve the medication, he could not stay awake in class and was informed that he would be reprimanded by officers for falling asleep. (*Id*. at 5.)

The evidence in the record confirms that Plaintiff's neurologist recommended consideration of a Ritalin trial to address Plaintiff's concerns about the fatigue associated with his disease and the impact of the fatigue on his ability to attend, or to concentrate in, classes he was taking. (*See* Dkt. # 26, ¶ 11 and Ex. 3.) The neurologist also recommended a trial decrease in another medication, Baclofen, to see if that change in his regimen would help with his fatigue. (*Id*.) The CRC noted in its report rejecting the recommendation for Ritalin, that Ritalin is one of three first line agents for fatigue in MS patients and that plaintiff was already receiving one of those, Amantadine. (*Id*., ¶ 12 and Ex. 3.) The CRC further noted that Ritalin is thought to have significant abuse potential, and that medical providers had already decreased Plaintiff's Baclofen

REPORT AND RECOMMENDATION - 12

dosage in an effort to address his concerns regarding fatigue. (*Id.*) Finally, the CRC noted that Plaintiff was on several sedating medications and that clinical monitoring of his condition should continue. (*Id.*, Ex. 3.)

Once again, though Plaintiff apparently was denied the treatment he desired, he was not denied all treatment for his fatigue. The record makes clear that Plaintiff was already receiving a first line drug for his fatigue at the time the CRC rendered its decision regarding his neurologist's recommendation for Ritalin. (*Id.*) Subsequently, the DOC accommodated Plaintiff's concerns regarding his fatigue by permitting him to attend classes half time. (*See* Dkt. # 7 at 5, 19; Dkt. # 26, ¶ 13.) Though it appears from Plaintiff's complaint that these accommodations did not entirely resolve the issues stemming from his fatigue, it is clear that Plaintiff's concerns regarding his fatigue were not ignored by DOC staff. Plaintiff has not produced any evidence demonstrating that Defendants were deliberately indifferent to his medical needs with respect to the way in which they addressed his concerns regarding fatigue. He therefore has not established an Eighth Amendment violation.

### D.    Equal Protection

Plaintiff also alleges, in a very conclusory fashion, that Defendants violated his right to equal protection when they failed to properly treat his serious medical needs. (*See* Dkt. # 7 at 8.) In order to state an equal protection claim under § 1983, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class. *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Plaintiff alleges no facts demonstrating that any named Defendant knowingly or intentionally discriminated against him, or that he is a member of a protected class. Plaintiff therefore fails to state a viable equal protection claim.

REPORT AND RECOMMENDATION - 13

### E. Failure to Train and Supervise

Plaintiff asserts in his complaint that Dr. Julia Barnett and Dr. Steve Hammond failed to properly train and supervise their subordinates, resulting in the violation of Plaintiff's Eighth and Fourteenth Amendment rights. (Dkt. # 7 at 6.) As Plaintiff has not established any violation of his constitutional rights, his claims against these supervisory officials necessarily fail as well.

## IV. CONCLUSION

Based on the foregoing, this Court recommends that Defendants' motion for summary judgment be granted, and that Plaintiff's complaint and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **twenty-one (21)** days after the filing of this Report and Recommendation. Objections, and any response, shall not exceed three pages. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar **fourteen (14)** days after they are served and filed. Responses to objections, if any, shall be filed no later than **fourteen (14)** days after service and filing of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on the date that objections were due.

DATED this 24th day of May, 2019.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION - 14